PECK (ZANE v.). See Case No. 18,200.

PECKHAM (BARSTOW v.). See Case No. 1,-064.

PECKHAM (BOUTOUR v.). See Case No. 1,-707.

------

## Case No. 10,897.

### PECKHAM v. BURROWS.

[3 Story, 544.] 1

Circuit Court, D. Rhode Island. Nov. Term, 1844.

BANKRUPTCY—PREFERENCES—CREDITOR's KNOWL-EDGE OF DEBTOR's INSOLVENCY.

1. Where A and B. partners, made certain conveyances to a certain creditor of the bulk of their property, to the amount of $36,000, being at the same time indebted to an equal amount— and subsequently became bankrupts; it was held, that such a conveyance was "in contemplation of bankruptcy," and in fraudulent preference of creditors.

[Cited in Ashby v. Steere, Case No. 576; Rison v. Knapp, Id. 11,861.]

2. To constitute a conveyance "in contemplation of bankruptcy," it is not necessary, that the professed creditor should know of the debtor's insolvency, or should co-operate with him to obtain a priority of payment.

[Cited in Ashby v. Steere, Case No. 576; Case v. Citizens' Bank of Louisiana, Id. 2,489; Casey v. La Societe De Credit Mobilier, Id. 2,496; Roberts v. Hill, 24 Fed. 574.]

Bill in equity. The bill in substance set forth. that on the 20th day of September, A. D. 1842, a petition was filed in the district court within and for the district of Rhode-Island sitting in bankruptcy, by the Franklin Foundry and Machine Company of Providence, creditors of said John F. Phillips &

------

1 [Reported by Albert Brunner, Esq., and here reprinted by permission.]

1 [Reported by William Story, Esq.]

Son, against said John F. Phillips & Son, in which it was alleged that said John F. Phillips & Son had become bankrupts under the act aforesaid, by committing the acts following, viz:

On the 25th day of January, 1842, by making a fraudulent conveyance, assignment, sale and other transfer of their lands, tenements, goods and chattels, and evidences of debt. On the 9th day of June, 1842, by removing their goods, chattels and effects, and by concealing them, to prevent them from being levied upon, and taken in execution, or by other process. That said petition was continued in said court from time to time, until the 27th day of May, A. D. 1843, when the said John F. Phillips & Son were by said district court declared bankrupt, under the said petition, and your plaintiff [Samuel W. Peckham] was, by consent of parties, appointed by the said court assignee of said J. F. Phillips & Son, according to the provisions of said bankrupt act [of 1841 (5 Stat. 440)]. That on the 25th and 29th days of January, A. D. 1842, (the said firm of John F. Phillips & Son being then insolvent, and knowing their own insolvency, and in contemplation of bankruptcy, having liabilities outstanding against them of a greater amount than the aggregate value of their company property, and of the private property of the individual members of said firm,) the said John F. Phillips,—and John F. Phillips and John G. Phillips, under the firm of John F. Phillips & Son,—and John G. Phillips, did make conveyances to John R. Burrows of said city of Providence, then a creditor of said firm, of the greater and more valuable part of their private and company property, consisting of certain real estate, situated in said city of Providence, and in the town of Warwick, in said Rhode Island district, and of certain real estate situated in Swansea, in the Massachusetts district, with a factory building, cotton house, dwelling house and other buildings thereon standing, and of a large quantity of cotton and woollen machinery in said factory building: the said property being nearly the whole of the visible property of John F. Phillips, and of John F. Phillips & Son, and of John G. Phillips, upon which they obtained credit, and with which they carried on business. That the said conveyances were made to the said John R. Burrows, by way of mortgage, to indemnify and save harmless him, the said John R. Burrows, of, and from all loss or damage, interest, costs or expenses, arising from, out of, or by reason of any indorsement or guaranty by the said John R. Burrows, made at the request and for the accommodation of said John F. Phillips & Son, of any and all notes and drafts theretofore made and executed by him, the said John F. Phillips, or by John F. Phillips & Son, or at any time thereafter, to be made and executed by him the said John F. Phillips, or by John F. Phillips & Son. That the said conveyances were made by the said John F. Phillips, and the said John F. Phillips & Son, and the said John G. Phillips, for the purpose of giving the said John R. Burrows, being a creditor and endorser as aforesaid, a preference and priority over the general creditors of said John F. Phillips and John G. Phillips, and are therefore a fraud upon said bankrupt act, and utterly void; and your orator claims that the property thus attempted to be conveyed, should be sold, and the proceeds thereof distributed among all the creditors of said John F. Phillips and John F. Phillips & Son, according to the provisions of the act aforesaid. But that the said John R. Burrows, well knowing the premises, but contriving to defraud the other creditors of said John F. Phillips and John F. Phillips & Son, and John G. Phillips, and to prevent them from realizing any dividend out of the proceeds of the property conveyed as aforesaid, still claims to hold the same by the conveyances aforesaid, and for the purposes therein named, against equity and good conscience, and contrary to the provisions and true intent and meaning of said bankrupt act.

The bill prays that a decree may be passed declaring the said conveyances to be a fraud upon said bankrupt act, and utterly void, and ordering the same to be delivered up into the custody of the court to be cancelled, and that the complainant and the creditors of the said John F. Phillips, and John F. Phillips & Son, and John G. Phillips, may have such other and further relief in the premises as is agreeable to equity and good conscience, and in conformity with the true intent and meaning of said bankrupt act.

The answer in substance stated, that the said conveyances in said bill mentioned, were made on the 25th and 29th days of January, A. D. 1842, and the said petition filed on the 20th day of September, A. D. 1842, more than two months subsequent to said conveyances. And this defendant further saith, that at the time the said conveyances were made, he did not know or believe, that said John F. Phillips & Son, or either of them, had committed any act of bankruptcy, or that they, or either of them, intended to take the benefit of the bankrupt act. That said transaction was made in good faith, and under the following circumstances:

That the said John F. Phillips is connected by marriage with this defendant; that early in the year 1838, the said firm of John F. Phillips & Son, entered upon the business of manufacturing, and at that time requested this defendant to become their accommodation endorser. This defendant then made inquiries, from which he received a high estimate of the business abilities of said John F. Phillips, and also obtained from him the promise, (which was frequently renewed) to mortgage any or all of his property whenever requested by this defendant. Thereupon this defendant engag-

ed to become the accommodation endorser of said John F. Phillips & Son. But the extent and amount of said endorsements were not fixed or limited by any agreement or understanding between the said John F. Phillips or John G. Phillips, or either of them, and this defendant. That this defendant continued to endorse for said firm, and to large and increasing amounts, until the failure of said firm, without receiving any compensation therefor,—without any contract for compensation. That this defendant never knew or believed, previous to said failure, that said firm were not able and willing to meet all their liabilities, and to pay all just claims against them, whenever they fell due. That in the month of December, A. D. 1841, and for the space of several weeks, at various times subsequent, he requested said firm and the members thereof, to make the said conveyances. That the cause, and the only cause which induced this defendant to make said requests, was this. That one of the children of this defendant had been suffering under a disease, which affected the mind, and which would (as the defendant feared and anticipated) leave the child deprived of reason, and for life helplessly dependent. Your defendant therefore desired to place this small property (which he estimated at about ten thousand dollars,) in a position as secure as the laws could make it. He asked that, in accordance with the business practice of this community, and the frequent offers and promises of said Phillips, the said conveyances should be made to him for the reason above mentioned, and for that reason only. That he made this request several times during the six weeks preceding the date of the said conveyances. That the said Phillips delayed the same, without giving any reason therefor, other than the occupation of his time by his business engagements. This defendant further saith, that he had determined not to endorse for said firm, or either or both of them, to an amount greater than ten or twelve thousand dollars. That this, his intention, had never been expressed, nor according to his best knowledge and belief had it been made known in any way to the said John F. or John G. Phillips. That he found the extent of his endorsements unexpectedly increasing; from about five thousand dollars at the time of said conveyances, to about sixteen thousand at the time of the said failure. That his business began to be embarrassed by the extent of his said endorsements, that his reciprocal endorsers, Joseph Burrows & Son, intimated to this defendant, that dissatisfaction with his endorsing to such an amount for said Phillips. That the business in which the said Phillips was engaged, and value of his factory property, was greatly depressed and constantly falling in the market. This defendant, therefore, expressed to the said Phillips his unwillingness to increase the amount of his endorsements, about the first day of April. That this was the first time he had ever expressed, or in any way intimated such a disposition to the said Phillips. That the said Phillips called in a mutual friend, and the three made an examination of the said Phillips's business, in the course of which the said Phillips stated that, during the ensuing sixty days, he could put into his business ten thousand dollars. That the said Phillips at this time, namely, on the evening of the 4th day of April, 1842, strongly urged this defendant to continue to endorse his paper, and to increase the amount. That the said friend, a business man and manufacturer, told this defendant that he could safely do so, after having made the said examination into Phillips's business. But this defendant was unwilling, from the reason existing in his family, from the inconvenience to his own business, and the dissatisfaction and embarrassment to his endorser, as well as the unfavorable prospects of business, to increase his endorsements, and absolutely refused then, and for the first time, so to do.

This defendant further denies all charges of collusion, confederacy and fraud in said bill contained. He saith, that at the time said requests were made, and said conveyances executed, he supposed and believed that said Phillips & Son were solvent, and according to his best information and belief, said Phillips & Son entertained the same opinion. That said conveyances were reluctantly made by said Phillips & Son, upon the request of this defendant. That the said Phillips was surprised at the refusal of the said Burrows to increase the amount of his liabilities, and strongly urged this defendant to continue his endorser.

The defendant prays that the said bill be dismissed with his costs.

Mr. Whipple and Hazard & Jenckes, for plaintiff.

Tillinghast & Bradley and A. C. Greene, for defendant.

STORY, Circuit Justice. Upon the argument in this case it was admitted by the defendant's counsel, that they did not contest the general principles of law stated on the other side, so far as they were properly applicable to the case. The main, if not the whole controversy, therefore, turns upon matters of fact. I have considered these matters deliberately, and am, on the whole, of opinion, that the conveyances stated in the bill and answer, as executed by the bankrupts, were made by them in contemplation of bankruptcy or insolvency, and with a design, in that event, to give a preference to the defendant over all his other creditors, in fraud of the bankrupt act of 1841 (chapter 9).

The facts are somewhat complicated, and I am not aware, that any useful purpose would be subserved, at least, so far as my

own judgment is concerned, by minutely examining them at large. I wish, therefore, merely to state, that the evidence satisfactorily establishes to my mind, that the bankrupts were, at the time of those conveyances, either absolutely insolvent, or in a state so nearly approaching it, that they must have contemplated insolvency as in a high degree probable, if not inevitable; and that these conveyances were designed, in that event, to secure a preference to the defendant, as their drawer and guarantor, a preference over all their other creditors. These conveyances, as we shall presently see, cover a very large proportion of all the property of the bankrupts. They were then owing large debts, fully equal in amount to their property, which were then due or soon to become due; and, without the aid of the defendant to sustain them by his endorsements and credit, they could not go on in business. It was under these circumstances that the conveyances were made. Now, nothing can be clearer or better founded in reason and common sense than the rule, that every man must be presumed to know and comprehend the natural results of his own conduct. He, who being deeply in debt, and therefore embarrassed for want of sufficient means, which are, used moderately, applicable to his relief, applies to another person for present and future aid and succour, and conveys to him the title of all his property, in order that this aid and succour may be instantly given and constantly continued, as it must be to be effectual, cannot but know, that he is in imminent danger of stoppage in his business, and of being reduced to immediate insolvency; and by such conveyances he does in fact give, and must be presumed to intend to give a preference and security to that person in that very event over all his other creditors. What is this, but making the conveyance in contemplation of bankruptcy or insolvency, with an intent, in that event, to give that person a preference over all other creditors? I confess, that in my view of the facts, with the deep indebtment of the bankrupts, and the involved state of their assets, I do not well see, how a reasonable hope could be indulged of escaping bankruptcy. It was confessedly inevitable, if the aid or succour of the defendant as endorser, or guarantor, was subsequently, at any time, withdrawn. It is not an unimportant fact, that these conveyances were made upon the very eve of the period when the bankrupt act was to come into full and complete operation. They were made on the 25th and 29th of January, 1842; the bankrupt act took full effect on the 1st of February, 1842; and the bankrupts actually failed in the beginning of April following,—that is, within little more than two months after the conveyances were executed. How it is possible, under such circumstances, to escape the conclusion, that a total stoppage of business

was then in the open vision of the bankrupts as a probable, nay, a certain event, unless the aid of the defendant, or some other responsible endorser or guarantor, could be obtained, I profess not to be able to understand. No new or extraordinary events, changing the fortune of the bankrupts in any essential manner, are shown to have occurred in the intermediate period between the close of January and the beginning of April. The effort, therefore, of the bankrupts, was a desperate effort to relieve themselves from the embarrassments of debts which were daily pressing more and more heavily upon them. The very conveyances show, that they were not made merely as an indemnity to the defendant to cover past responsibilities, but that they were designed also to include future responsibilities, which should be incurred by them. He was to sustain the credit of the bankrupts, as far as he might or would, in the struggle to avert the impending dangers; and when he stopped his endorsements and guaranties, they must sink, and they did sink, under the superincumbent weight of their debts.

The learned counsel on the opposite side differ widely in their views of the evidence. There are three points which seem to be the most important, and should be examined with a close and scrutinizing care. First, what, at and about the close of January, 1842, was the actual amount of the debts of the bankrupts; secondly, what was the true and real value of their assets at the same period; thirdly, what was the amount of the property included in the conveyances to the defendant. Now, it seems to me clear, from the evidence, that the debts of the firm were upwards of $36,000, at the time of these conveyances. The assets of the firm did not, at that time, according to the estimates of the bankrupts themselves, exceed that amount. But, in point of fact, the basis of this very statement is not a satisfactory one; for it is an estimate of the value of the property at its cost, and not at its then marketable value. Indeed, there is no proof whatever, that the property could then have been turned into cash to meet the debts, as they became due, at any prices, which would have paid the debts. It would have been a most extraordinary circumstance, if the property would not, under the circumstances, have fallen far short of the amount of the debts, if sold, or if the sales could have been effected without great sacrifices. And, then, as to the amount of the property of the bankrupts not included in their conveyances, it was manifestly very small. The estimate of the property of the bankrupts at the time of those conveyances, as made by themselves, was about $36,000; and from what I have been able to gather from the schedules in the case, (which are so obscure and ill digested that I have not been able to arrive at any very precise conclusion,) all the property not included in

these conveyances does not exceed two thousand dollars, and seems apparently much less. So that here we have the bankrupts, owing at the time of these conveyances $36,000, the full amount of all their assets, and indeed, upon all reasonable calculations, far more, who convey to the defendant, their indorser and guarantor, the bulk of their property nominally for the consideration of $5,000, but in reality for his existing liabilities to that amount for them, and also for future liabilities to be incurred by him on their account. So that, stripped of its artificial form, we here have an indebtment of the bankrupts to the full extent of all their means, to say the least of it, with a possibility of escaping from immediate insolvency and stoppage of their business only by future credits, to be given to them by the defendant at his pleasure, and those credits avowedly to be given upon the basis of a direct preference over all the other creditors, in case of that very insolvency and stoppage of business. It is difficult for me to perceive a more clear case for the application of the act of congress to conveyances made "in contemplation of bankruptcy, and for the purpose of giving a preference and priority over the general creditors of the bankrupts."

I have thus stated my impressions of the force and results of the evidence in the case. I regret that it is so inexact and imperfect in its actual presentation. I should have thought, that the case might well have been referred to a master to ascertain the exact amount of the debts of the bankrupts on the 25th and 29th of January, 1842, the exact marketable value of all their assets at the same period, and the exact amount of property not included in the conveyances of the 25th and 29th of January, 1842. I am still willing to do so, if the parties desire it. But upon the actual posture of the evidence, it seems to me, that the conclusions, which I have already suggested, are fully maintained, and I have, therefore, not thought myself at liberty to put the parties to the expense of a reference to a master, unless they should be anxious to have it made.

One other point has been suggested at the argument, which it is proper to notice: and that is, that even supposing that the bankrupts did make these conveyances in contemplation of bankruptcy, for the purpose of giving a preference and priority over the other creditors, yet unless the defendant knew of that fact, and was a party to the arrangement, with that knowledge, he is to be treated as a bona fide purchaser for a valuable consideration without notice, and as saved out of the provisions of the second section of the bankrupt act. In my view of the present case, that point does not arise; for it is impossible for me to doubt, that the facts connected with these conveyances were not such as necessarily to put the defendant upon full inquiry as to the

debts, the resources, and the situation of the bankrupts. He could not but know, that they were in a state inevitably leading them to bankruptcy, unless he sustained them by future large credits as well as by his past credits. If, under such circumstances, he chose to shut his eyes, and to make no inquiries, but to place confidence in the hopes of the bankrupts, he must take the consequences of his own voluntary confidence and indolent indifference. He took the conveyances, knowing that they contained the bulk of the visible property of the bankrupts, and that it rested solely with him whether they should stop business or not; and he was not bound to sustain them by new credits for any certain period or for any certain amount.

But I am strongly of opinion, that, upon the true policy and interpretation of the second of the bankrupt act, it is not necessary for the preferred creditor to have any knowledge or co-operation with the bankrupt in arranging a preference in contemplation of bankruptcy. It is sufficient, that the bankrupt himself intends such a preference in contemplation of bankruptcy, to bring the case within the provisions of the act. All conveyances made by the bankrupt in contemplation of bankruptcy, for the purpose of giving any preference or priority over the other creditors, are by the express terms of the act declared to be void. The second proviso in the section is a limitation merely upon the proviso of the act, and does not apply to the preceding enacting clause.

Upon the whole, my opinion is, that the plaintiff is entitled to a decree, declaring the conveyances of the 25th and 29th days of January, 1842, to be fraudulent and void in the sense of the bankrupt act, and that the plaintiff is entitled accordingly to the relief which is sought by the bill.

Decided accordingly.